## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 11-013-1 |
| | : | |
| ANTHONY DOUGLAS ELONIS | : | |

## O R D E R

**AND NOW**, this        day of                    , 2011, upon consideration of the Defendant's

Motion to Dismiss the Indictment, and the government's response thereto, it is hereby

**ORDERED** that the Motion is **GRANTED**, and the indictment against Anthony Elonis is

**DISMISSED** in its entirety and with prejudice.


**BY THE COURT:**


_____
**THE HONORABLE LAWRENCE F. STENGEL**
**United States District Court Judge**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **CRIMINAL NO. 11-013-1** |
| | : | |
| ANTHONY DOUGLAS ELONIS | : | |


## DEFENDANT'S MOTION TO DISMISS THE INDICTMENT


For all the reasons stated in the attached Memorandum of Law, defendant Anthony

Elonis, by and through his undersigned counsel, respectfully requests that this Court enter an

order dismissing the indictment in its entirety and with prejudice.



Respectfully submitted,

*/s/ Benjamin B. Cooper*

_____

BENJAMIN B. COOPER
Assistant Federal Defender

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 11-013-1** |
| | : | |
| **ANTHONY DOUGLAS ELONIS** | : | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>DEFENDANT'S MOTION TO DISMISS THE INDICTMENT</u>**

Defendant Anthony Elonis ("Mr. Elonis"), by and through his counsel, Benjamin B.

Cooper, Assistant Federal Defender, Federal Community Defender Office for the Eastern District

of Pennsylvania, respectfully moves to dismiss the instant indictment on several bases.  First, the

communications alleged to be threats in the indictment do not constitute "true threats."  Second,

the indictment attempts to criminalize "pure speech," which is protected under the First

Amendment of the Constitution.  Third, the indictment fails to state an offense, because it does

not allege that Mr. Elonis subjectively intended to convey a threat to injure the person of another.

Fourth, 18 U.S.C. § 875(c), which prohibits the knowing transmission of any communication

containing "any threat to injure the person of another," is unconstitutionally overbroad, as the law

proscribes a substantial amount of speech protected by the First Amendment.  Finally, 18 U.S.C.

§ 875(c) is unconstitutionally vague, because it fails to put a reasonable person on notice as to

what speech the statute proscribes.  Therefore, for all of these reasons, the indictment must be

dismissed in its entirety and with prejudice.

I.      **BACKGROUND**

Mr. Elonis was arrested on December 8, 2010, and charged in a criminal complaint with transmitting in interstate commerce a communication containing a threat to injure the person of another in violation of 18 U.S.C. § 875(c).

On January 7, 2011, the grand jury returned a five-count indictment against Mr. Elonis charging a violation of 18 U.S.C. § 875(c).  Count One of the indictment charges Mr. Elonis with making threatening communications to patrons and employees of Dorney Park and Wildwater Kingdom from October 19, 2010 through October 22, 2010.  Count Two of the indictment charges Mr. Elonis with making threatening communications to T.E., a person known to the grand jury, from November 6, 2010 through November 15, 2010.  Count Three of the indictment charges Mr. Elonis with making threatening communications to employees of the Pennsylvania State Police and the Berks County Sheriff's Department on November 15, 2010.  Count Four of the indictment charges Mr. Elonis with making threatening communications to a kindergarten class of elementary school children on November 16, 2010.  Count Five of the indictment charges Mr. Elonis with making threatening communications to an agent of the Federal Bureau of Investigation on November 30, 2010.  The charges arose from Mr. Elonis' postings on his Facebook.com ("Facebook") account.

For the reasons contained within this memorandum of law, Mr. Elonis respectfully requests that this Court dismiss the indictment against him in its entirety and with prejudice.

II.     **DISCUSSION**

A.      **The Statute**

Section 875 (c) states as follows:

2

> Whoever transmits in interstate of foreign commerce any communication
> containing any threat to kidnap any person or any threat to injure the
> person of another, shall be fined under this title or imprisoned not more
> than five years, or both.

18 U.S.C. § 875(c).

The Third Circuit's Model Criminal Jury Instructions do not include a standard instruction for the elements of 875(c).  Instructions for 875(c) are set forth in the Eleventh Circuit Pattern Jury Instructions (Criminal Cases), Offense Instruction 30.3 (2010):

> The Defendant can be found guilty of this crime only if the Government
> proves beyond a reasonable doubt that the Defendant knowingly sent
> a message in [interstate] [foreign] commerce containing a true threat [to
> kidnap any person] [to injure the person of another].

> [To transmit something in "interstate commerce" means to send it from
> a place in one state to a place in another state.]

> [To transmit something in "foreign commerce" means to send it from
> a place in the United States to anyplace outside the United States.]

> A "true threat" is a serious threat – not idle talk, a careless remark, or
> something said jokingly – that is made under circumstances that
> would lead a reasonable person to believe that the Defendant
> intended to [kidnap] [injure] another person.

> The heart of the crime is intentionally sending a true threat in
> interstate or foreign commerce.  The Government doesn't have to
> prove that the Defendant intended to carry out the threat.

In considering the above essential elements, a significant legal issue in this case is whether the communications Mr. Elonis posted on Facebook fall within the narrow "true threats" exception to the broad protections of the First Amendment or whether they are, instead, protected speech.  For the reasons discussed below, it is clear that none of the communications set forth in the indictment constitute "true threats" and they are, therefore, protected speech under the First

Amendment.

## B.    THIS INDICTMENT CRIMINALIZES PURE SPEECH THAT IS CONSTITUTIONALLY PROTECTED BY THE FIRST AMENDMENT

Because the indictment in this case alleges that Mr. Elonis transmitted in interstate commerce communications containing a threat to injure the person of another in violation of 18 U.S.C. § 875(c), and § 875(c) criminalizes pure speech, it must be evaluated in accordance with protections of the First Amendment.  "[T]he bedrock principle underlying the First Amendment... is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."  Texas v. Johnson, 491 U.S. 397, 414 (1989).  Indeed, the Supreme Court has declared that one of the gravest threats to First Amendment freedom of speech is a law that criminalizes protected speech.  For example, it is well established that "the expression of racist and antisemitic views," are protected activities and may not be circumscribed by the state.  Nat'l Socialist White People's Party v. Ringers, 473 F.2d 1010, 1015 (4th Cir. 1972).  "The First Amendment commands, 'Congress shall make no law . . . abridging the freedom of speech.'  The government may violate this mandate in many ways . . . but a *law imposing criminal penalties on protected speech is a stark example of speech suppression*."  Ashcroft v. Free Speech Coalition, 535 U.S. 234, 244 (2002) (emphasis added; citations omitted).

Our constitutional tradition, however, has exempted certain narrowly defined categories of speech from that protection.  See Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72. Among them are obscenity, fighting words, and "true threats."  Id.; Watts v. United States, 394 U.S. 705 (1969).  Those categories are unprotected, the Court has explained, because our history

4

has deemed them to be "no essential part of any exposition of ideas, and [to be] of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."  Chaplinsky, 315 U.S. at 572. Notwithstanding, "analysis of *content restrictions* must begin with a healthy respect for *the truth that they are the most direct threat to the vitality of First Amendment rights*."  Collin v. Smith, 578 F.2d 1197, 1202 (7th Cir.), cert. denied, 439 U.S. 916 (1978) (emphasis added; citations omitted).

Mr. Elonis's Facebook postings should be undoubtedly viewed as protected speech under the First Amendment.  These postings do not constitute "true threats;" rather, they are nothing more than artistic expression and/or very crude, offensive methods of venting his frustration and anger with his job and personal life, categories of speech that the Supreme Court has previously acknowledged as protected.  See Watts, 394 U.S. at 708 (1969).  According to discovery, the postings actually gave rise to a spirited exchange of opinions by Mr. Elonis's Facebook "friends" who sometimes disagreed or expressed vexation with him.  The postings and their aftermath thereby accomplished one of the goals of the First Amendment: the free and unfettered exchange of ideas and opinions in the public arena.  The postings were also placed in rhyme settings, poetically; and with disclaimers that Mr. Elonis was writing fictitious lyrics and expressing his constitutional right to free speech.  They were related to Mr. Elonis's attempted impression of art and therefore entitled to 1st Amendment protection, Kois v. Wisconsin, 408 US 229 (1972).

Likewise, Mr. Elonis' posted statements cannot be punished as "fighting words" or "obscenity."  None of Mr. Elonis' Facebook friends were provoked, or likely to be provoked, into a violent reaction by his statements.  And, although some of Mr. Elonis' postings contain

expletives and violent phrases, these phrases cannot be criminalized as obscenity.  See United

States v.Stevens, __ U.S. __, 130 S.Ct. 1577 (2010).  The communications alleged to be threats

in the indictment cannot, therefore, be suppressed by the government, either through

criminalization or censorship, because they are constitutionally protected speech.

C.      **THE GOVERNMENT IS REQURED TO PROVE TRUE THREATS OCCURRED BEFORE SPEECH CAN BE PUNISHED AS CRIMINAL LIABILITY**

The dictionary definition of the term "threat" is "a declaration of an intention or

determination to inflict punishment, loss, or pain on another, or to injure another."  Barron's Law

Dictionary (3d ed.1991).  Therefore, at the very least, the statute as charged in Mr. Elonis' case

requires that the government prove that Mr. Elonis posted words that stated an intention to kill or

inflict bodily harm on a particular individual or group of individuals.  In addition, because

statutes such as section 875(c) punish pure speech and therefore carry the very real risk of

impinging on speakers' First Amendment rights, the Supreme Court has consistently stated that

they must be narrowly construed and applied.  The First Amendment concerns in application of

threat statutes therefore underlie the requirement that speech constitute a "true threat" before the

speech can be punished.

The starting point for examination of the true threat requirement is Watts, supra, a case in

which the Supreme Court examined the difference between true threats and protected speech in

the context of 18 U.S.C. § 871, a statute with language very similar to the language of § 875(c).[1]

---

[1]Title 18 U.S.C. 871 states, "Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States, the President-elect, the Vice President or other officer next in the order of succession to the office of President of the United States, or the Vice

In <u>Watts</u>, the Supreme Court held, as a matter of law and contrary to the jury's verdict, that a young man's statement at a rally that "If they ever made me carry a rifle (referring to the draft) the first man I want to get in my sights is L.B.J." was not a "true threat" under section 871. The Court reasoned that, despite the government's legitimate interest in preventing the damaged caused by threatening words towards the President, the risk of curtailing speech prohibited the prosecution. "[A] statute . . . .which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind." <u>Id</u>. at 707. The Court expressed "grave doubts" about the appellate courts' construction of the willfulness element as "an apparent willingness" to carry out the threat, although it did not decide what the willfulness element properly required. <u>Id</u>. at 707-08. It did, however, make clear that in addition to being willful, the words must constitute a "true threat" for the prosecution to be constitutional.

> But whatever the "willfulness" requirement implies, the statute
> initially requires the Government to prove a true "threat." We do
> not believe that the kind of political hyperbole indulged in by
> petitioner fits within that statutory term. For we must interpret the
> language Congress chose against the background of a profound
> national commitment to the principle that debate on public issues
> should be uninhibited, robust, and wide open, and that it may well
> include vehement, caustic and sometimes unpleasantly sharp
> attacks on government and public officials.

<u>Id.</u> at 708 (internal quotations omitted). Taken in context, the Court concluded that the defendant's words could not be interpreted as a true threat, as a matter of law, reversing his conviction.

---

President-elect, or knowingly and willfully otherwise makes any such threat against the President, President-elect , Vice President or other officer next in the order of succession to the office of President or Vice President-elect, shall be fined under this title or imprisoned not more than five year, or both."

Unfortunately, the Supreme Court in <u>Watts</u> did not give the lower courts guidance as to the test for what constitutes a true threat.  Commentators agree that the Supreme Court's true threats doctrine, and the First Amendment, require both that in context the words be reasonably understood as threats under an objective standard, and that the speaker intend them to be understood as threats.  <u>See</u> <u>generally</u> G. Robert Blakey and Brian J. Murray, <u>Threats, Free Speech, and the Jurisprudence of the Federal Criminal Law</u>, 2002 B.Y.U. L. Rev. 829, 921-23 (2002) (hereinafter "<u>Threats</u>"); Jennifer E. Rothman, <u>Freedom of Speech and True Threats</u>, 25 Harv. J. L. & Pub. Pol'y 283, 295 (2001) (hereinafter "<u>Freedom of Speech</u>").  While the Court in <u>Watts</u> may not have given the lower courts explicit guidance in defining and applying the true threats doctrine, <u>two later opinions</u> clarify the Supreme Court's test.  Moreover, unlike the tendency among the lower courts to broaden the definition, the Supreme Court's approach continues to be strict and narrow in view of the important First Amendment interests involved.

First, in <u>NAACP v. Claiborne Hardware Co.</u>, 458 U.S. 886 (1982), a number of white merchants brought suit following a boycott organized by members of the black community.  The evidence showed that Charles Evers, field director for the NAACP and one of the defendants, made a number of speeches to large groups encouraging participation in the boycott, and his words were strong and, to many, frightening.  For example, he told listeners that "'any uncle toms' who broke the boycott would 'have their necks broken' by their own people."  <u>Id.</u> at 900 n.28.  He told others that violators of the boycott would be "disciplined," and that "if we catch any of you going in any of them racist stores, we're gonna break your damn neck."  <u>Id.</u> at 902. "Enforcers" were placed outside stores to see who violated the boycott, and their names were read aloud in meetings.  <u>Id.</u> at 904.  While the boycott was mostly peaceful, four violators of the

boycott experienced violence including shots fired into their homes and a brick thrown threw another's windshield.  The state courts upheld the finding of liability against the defendants.

The Supreme Court reversed.  Emphasizing the importance of free speech under our constitution and in our society, the Court concluded that Evers' "did not exceed the bounds of protected speech." Id. at 929.  Citing Watts in a footnote, the Court stated: "Strong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases.  An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause.  When such appeals do not incite lawless action, they must be regarded as protected speech.  To rule otherwise would ignore 'the profound national commitment' that 'debate on public issues should be uninhibited, robust, and wide-open.'" 458 U.S. at 928 & n.71 (quoting New York Times Co. v. Sullivan, 376 U.S. __, 270 (19 )).  Thus, Mr. Evers' words – including statements that people's necks would be broken – did not constitute "true threats" and therefore were not actionable.  See also Madsen v. Women's Health Center, Inc., 512 U.S. 753, 773-74 (1994) (striking down those portions of lower court's ban on protests outside abortion clinic that prohibited display of certain posters and prohibited protesters from speaking to persons seeking clinic services within 300 feet of the clinic because prohibitions would bar both protected and unprotected speech); R.A.V. v. City of St. Paul, 505 U.S. 377, 388 (1992) (striking down striking hate speech legislation used to prosecute cross-burning, and citing Watts for proposition that state can ban true threats of physical violence to president but not just content-based threats).

Second, on April 7, 2003, the Supreme Court issued its decision in Virginia v. Black, 538 U.S. 343 (2003), in which a plurality of the Court upheld the Virginia Supreme Court's reversal

9

of certain criminal convictions under Virginia's cross-burning statute on First Amendment

grounds.  In that portion of Justice O'Connor's opinion in which she was writing for the

majority, the Court clarified its previous rulings with respect to 18 U.S.C. § 871, and for the first

time announced the standard for determining what is a "true threat" under <u>Watts</u>, and clarifying

that it requires proof of a defendant's state of mind.  The Court, in reviewing the types of statutes

that are constitutional under the First Amendment despite being directed at speech, stated that

"the First Amendment . . . permits a State to ban a 'true threat.'" <u>Id.</u> at 358-59 (citing <u>Watts</u>, 394

U.S. at 708; <u>R.A.V. v. City of St. Paul</u>, 505 U.S. 377, 388 (1992)).  The Court then went on to

define a true threat:

> "True threats" encompass those statements where the speaker
> <u>means</u> to communicate a serious expression of an intent to commit
> an act of unlawful violence to particular individual or group of
> individuals. . . .  The speaker need not actually intend to carry the
> threat out.  Rather, a prohibition on true threats protects individuals
> from the fear of violence and from the disruption that fear
> engenders, in addition to protecting people from the possibility that
> the threatened violence will occur. . . .  Intimidation . . . . is a type
> of true threat, where a speaker directs a threat to a person or group
> of persons <u>with the intent of placing the victim in fear</u> of bodily
> harm or death.

<u>Id.</u> at 1548 (emphasis added, internal quotation marks omitted) (citing <u>Watts</u>, 394 U.S. at 708;

<u>R.A.V.</u>, 505 U.S. at 388).

The majority's words in this passage, carefully chosen so as to clearly parse the

significance of its First Amendment precedent, demonstrates that there is indeed a subjective

element to the "true threat" element of a threat prosecution.  Specifically, the defendant must

have intended to communicate a "threat," meaning a serious expression of intention to do harm.

Stated another way, the defendant must have intended to place those hearing the words in fear

10

that violence would be done, in this case, to a particular individual or group of individuals.

The requirement that a defendant intend to communicate a serious expression of intention to do harm (in other words that the defendant intended to communicate a "threat"), is necessary given that section 875(c) is a criminal offense punishing speech.  If there were no state of mind requirement, the statute would be punishing mere negligent speech, in other words speech that a "reasonable" person would expect to be interpreted in a given way.  See, e.g., Freedom of Speech, 25 Harv. J.L. & Pub. Pol'y at 314-19 (explaining reasons under criminal and First Amendment law for inadequacy of objective standard for measuring true threat).  It was for this very reason that Justice Marshall, in his concurring opinion in Rogers v. United States, 422 U.S. 35, 43 (1975), recommended a subjective standard for measuring a true threat.

In Rogers, a 24-year old unemployed man with a ten-year history of alcoholism wandered into a coffee shop "behaving in a loud obstreperous manner.  He accosted several customers and waitresses, telling them, among other things, that he was Jesus Christ and that he was opposed to President Nixon's visiting China because the Chinese had a bomb that only he knew about, which might be used against the people of this country.  In the course of his various outbursts, "Rogers announced that he was going to go to Washington to 'whip Nixon's ass,' and to 'kill him in order to save the United States.'" Id. at 42.  When the arresting officer arrived and interviewed Rogers, "Rogers replied that he didn't like the idea of the President's going to China and making friends with the Chinese, our enemies," and that "I'm going to Washington and I'm going to beat his ass off.  Better yet, I will go kill him.'" Id.  (Marshall, J., concurring).

The majority of the Supreme Court reversed the conviction under section 871 on grounds having to do with the jury deliberations, but Justice Marshall would have reached the "true

threat" argument that the defendant had also pursued.  Noting that the majority of courts of

appeal had adopted one or another "objective" test of what constituted a threat, Justice Marshall

observed that the Court had expressed "grave doubts" about that test in Watts.

> In Watts, we observed that giving § 871 an expansive construction
> would create a substantial risk that crude, but constitutionally
> protected, speech might be criminalized. . . . Applying the statute
> with an eye to the danger of encroaching on constitutionally
> protected speech, we held that the comments in Watts fell outside
> the reach of the statute as a matter of law.  Although the petitioner
> in the present case was not at a political rally or engaged in formal
> political discussion, the same concern counsels against permitting
> the statute such a broad construction that there is a substantial risk
> of conviction for a merely crude or careless expression of political
> enmity.

Id. at 44 (Marshall, J., concurring).  Reviewing the legislative history of section 871, Justice

Marshall concluded that the drafters "plainly intended the bill to require a showing that the

defendant appreciated the threatening nature of his statement and intended at least to convey the

impression that the threat was a serious one.  The danger of making § 871 a mere 'technical

offense' or making 'innocent acts punishable' was clear to the sponsors of the Act."  Id. at 46

(Marshall, J., concurring).

Moreover, Justice Marshall was concerned that without a subjective intent requirement,

"the objective interpretation embodies a negligence standard, charging the defendant with

responsibility for the effect of his statements on his listeners.  We have long been reluctant to

infer that a negligence standard was intended in criminal statutes, see Morisette v. United States,

342 U.S. 246 (1952); we should be particularly wary of adopting such a standard for a statute that

regulates pure speech."  Id. at 47 (Marshall, J., concurring).  Finally, Justice Marshall reasoned

that the added deterrence gained by an objective standard would more likely hinder speech than

prevent threats from occurring: "If § 871 has any deterrent effect, that effect is likely to work only as to statements intended to convey a threat.  Statements deemed threatening in nature only upon 'objective' consideration will be deterred only if persons criticizing the President are careful to give a wide berth to any comment that might be construed as threatening in nature. And that degree of deterrence would have substantial costs in discouraging the 'uninhibited, robust, and wide-open' debate that the First Amendment is intended to protect."  Id. at 47-48 (Marshall, J., concurring) (quoting New York Times Co. v. Sullivan, 376 U.S. 254 (1962)). Therefore, Justice Marshall concluded that section 871 requires proof that the speaker intended his statement to be taken as a threat.

The clear direction of the Supreme Court's jurisprudence in this area is to err on the side of First Amendment protections, and to reserve application of a threat statute to those situations in which a defendant unambiguously and intentionally communicates an intention to kill a person under circumstances in which a reasonable person would understand that the words constituted a threat.

    1.    Mr. Elonis' Facebook Postings Do Not Constitute "True Threats"

Mr. Elonis' posted statements on his Facebook page do not constitute a "true threat" under 18 U.S.C. § 875(c) because, viewed in the context of Mr. Elonis merely exercising his right to speak freely within the confines of his home, and considering the lack of any specificity as to dates, times or places, as well as the reaction of his Facebook "friends" who viewed the postings, it is clear that the postings do not amount to serious threats.  The evidence is therefore insufficient to establish the "true threats" element.

Following the Supreme Court decision in Watts, the Third Circuit has articulated the

13

following three-part test for "true threats."  First, the statements must be "viewed 'in context'" to

determine whether they were truly threatening, or merely hyperbolic or crude statements, such as

offensively worded political rhetoric.  United States v. Kosma, 951 F.2d 949 at 553 (quoting

Watts, 394 U.S. at 708).  Second, the court should consider whether the posted statements were

"conditional" or whether they "specified the precise date, time and place" for carrying out the

supposed threat.  Id. at 554.  Third, the court should consider "the reaction of the listeners" and

whether they were laughing or took the threats seriously.  Id.  The court should also consider who

the "listeners" were, and whether the statements were directed [to the subject of the alleged

threat].  Id.  Application of this test here makes clear that Mr. Elonis' Facebook postings do not

constitute "true threats."

Regarding the first factor, the fact that Mr. Elonis' posted statements were not in "the

context of a political rally or debate," should not end the analysis.  Political rhetoric during a rally

or debate is just *one* example of a context in which a statement would not constitute a "true

threat."  Stand up comedy and jokes would certainly be another, United States v. Fuller, 387 F.3d

643, 647 (7th Cir. 2004), as would "a merely crude or careless expression of political enmity,"

Rogers v. United States, 422 U.S. 35, 44 (1975) (Justice Marshall concurring), or "innocuous

talk," United States v. Miller, 115 F.3d 361, 363 (6th Cir.), cert. denied, 522 U.S. 883 (1997).

Mr. Elonis' postings on his Facebook account is best described as "crude rhetoric" and

not "true threats."  Indeed, one of the most significant aspects of this context is the fact that Mr.

Elonis plainly was not trying to communicate his statements to his wife, employer, law

enforcement or an elementary school – just to his friends on Facebook.  See United States v.

Fenton, 30 F.Supp.2d 520, 524 (W.D. Pa. 1998) (D. Brooks Smith, J.) (in prosecution under 18

14

U.S.C. § 115 for threatening a U.S. official, noting that had defendant "hiked alone several miles into a forest and recited his diatribe only to himself, convicting him under § 115 would be tantamount to punishing his mere thoughts rather than any actual threat").  Indeed, this case cannot be divorced from its facts, and those facts include a man who is extremely unhappy with his former employer and upset with his estranged spouse and life in general, who, as a means to vent his frustration and anger, utilizes his Facebook page for cathartic and expressive purposes and with disclaimers that his works were lyrics and an exercise of free speech.

Regarding the second factor, although Mr. Elonis' statements were not "conditional," they also were not definite in that, unlike the defendant in Kosma, his statements did not specify a "date, time and place."  951 F.2d at 554.  Using Count Four of the indictment as an example, there is absolutely no evidence that Mr. Elonis had an idea of when he would allegedly be shooting a kindergarten class or where the elementary school was located.  This second factor thus does not weigh strongly in favor of viewing the Facebook postings as "true threats."

Regarding the third factor, "the reaction of the listeners" was to laugh at Mr. Elonis and not to view his posted statements as serious threats.  A review of several of Mr. Elonis' friends' responses to his postings, reveal that they did not view the statements as serious threats.  Indeed, none of the responses mentioned anything about a threat.  While occasionally expressing concern about his mental health in a half-hearted, joking manner, they did not contact law enforcement authorities and they did not seek to have him arrested for criminal behavior.  In fact, several of Mr. Elonis' Facebook friends recognized that Mr. Elonis had just let his anger and bad emotions get to the point where he thought he had to be nasty and violent, but they knew deep down inside that was not who he (Mr. Elonis) truly was as a person.  See Comments by Jeffrey Kleckner,

15

12/07/2010, 20:32:21.[2]  This factor thus weighs very strongly against viewing the postings as a

"true threat."  With the exception of his former colleague – Daniel Hall, Dorney Park Chief of

Park Patrol – none of Mr. Elonis' Facebook friends were afraid or concerned for their safety or

for the safety of the parties referenced in Mr. Elonis' posted statements.  It is certainly significant

that among Mr. Elonis' numerous Facebook friends who read his postings, the record reveals

only one who was sufficiently disturbed to actually notify the authorities.

Kosma was decided before Black.  This court should adopt the holding of Black and its

dictates.  In fact, the Ninth Circuit recently explained the elements of true threats.  In United

States v. Bagdasarian,  2011 WL 2803583, the 9th Circuit stated that a true threat is a speech that

the speaker intends to be understood as a threat and the audience reasonably believes it as a threat

(quoting Black, 538 U.S. 343, 359 (2003).  Thus, any chance between subjective and objective

tests is a false dichotomy.  See, United States v. Bagdasarian, 2011 WL 2803583 at 3 (July 19,

2011).  The Ninth Circuit court determined that the government must show sufficient evidence

not only that reasonable listeners would feel threatened by the speaker's behavior but also that

the speaker actually intended the speech be taken as a threat. (Id. at 8.)

The Elonis case is case is most analogous to another § 875(c) case in which a "true

threats" conviction was not sustained.  In United States v. Alkhabaz, 104 F.3d 1492 (6th Cir.

1997), the basis for the indictments against the defendant (known as Baker) was a series of email

messages he exchanged with another individual (known as Gonda) who shared with him an

---

[2]  Attached hereto as Exhibit "A."

16

interest in violence against women.[3]   As one message stated: "I highly agree with the type of

woman you like to hurt.  You seem to have the same taste I have.  When you come down, this'll

be fun!"  Id. at 14-22 (Krupansky, J., dissenting).  They had numerous discussions of their

mutual fantasies, and discussion of the logistics of abducting and injuring women.  One message

stated:

> As I said before, my room is right across from the girl's bathroom.
> Wiat until late at night. grab her when she goes to unlock the door.
> Knock her unconscious. and put her into one of those portable lockers
> (forget the word for it). or even a duffle bag.  Then hurry her out to the
> car and take her away ... What do you think?

Id.  Another stated: "I had a great orgasm today thinking of how you and I would torture this very

very petite and cute, south american girl in one my classes."  The other responded: "Just thinking

about it anymore doesn't do the trick .. I need TO DO IT."  Id.

Prior to trial, the defendant moved to quash the superseding indictment.  The district

court dismissed the superseding indictment, reasoning that the email messages sent back and

forth "did not constitute 'true threats' under the First Amendment and, as such, were protected

speech."  Id. at 1493.  On appeal, the Sixth Circuit did not directly address the First Amendment

issue, instead limiting its opinion to the question of whether the messages "initially satisfy the

requirements of Section 875(c)."  Id.  The Court ultimately concluded that the email messages

did not meet the requirements of the statute, and thus affirmed the decision of the district court.

---

[3]  Although the indictments were based on email messages, there was also evidence in the
record (which formed the basis for an earlier complaint) that Baker had penned a number of
"sadistic fictional 'short stories'" which he distributed on an electronic bulletin board.  These
articles "evince[d] an extreme and morbid fascination with the concept of the physical and
psychological abuse and torment of women and young girls, described in lurid detail, and often
culminating in murder."  Id. at 10 (Krupansky, J., dissenting).  One story was named after an
actual specific female classmate of Baker's.  Id.

Id. at 1496.

Drawing on United States v. DeAndino, 958 F.2d 146 (6th Cir. 1992), the Sixth Circuit

went on, however, to "consider[] the type of offense that Congress intended to prohibit when it

enacted Section 875(c)."  It wrote:

> To determine what type of action Congress intended to prohibit, it is
> necessary to consider the nature of a threat.  At their core, threats are
> tools that are employed when one wishes to have some effect, or
> achieve some goals, through intimidation.  This is true regardless of
> whether the goal is highly reprehensible or seemingly innocuous.

Id. at 1495.  After discussing several reasons why a threat could be made, it reached the

important conclusion that a true threat is defined in part by its apparent purpose:

> Although it may offend our sensibilities, a communication objectively
> indicating a serious expression of an intention to inflict bodily harm
> cannot constitute a threat unless the communication also is conveyed
> for the purpose of furthering some goal through the use of intimidation.

Id.  The Sixth Circuit then expressed this definition in terms of two requirements necessary for a

prosecution under § 875(c).  The Court wrote:

> Accordingly, to achieve the intent of Congress, we hold that, to
> constitute "a communication containing a threat" under Section
> 875(c), a communication much be such that a reasonable person
> (1) would take the statement as a serious expression of an intention
> to inflict bodily harm (the mens rea), and (2) *would perceive such
> expression as being communicated to effect some change or achieve
> some goal through intimidation* (the actus reus).

Id. (emphasis added).

Applying this standard, the Sixth Circuit found that the emails between the defendant and

his correspondent were not true threats, as they were not offered for the purpose of intimidating

anyone or forcing someone to do something.  It wrote:

18

> Even if a reasonable person would take the communications between
> Baker and Gonda as serious expressions of an intention to inflict
> bodily harm, no reasonable person would perceive such communications
> as being conveyed to effect some change or achieve some goal through
> intimidation.  Quite the opposite, Baker and Gonda apparently sent
> e-mail messages to each other in an attempt to foster a friendship based
> on shared sexual fantasies.

Id. at 1496.

It should also be noted that in this case there is no additional or circumstantial evidence of

a threat, as is often present in these cases.  For example, there is no evidence of any attempt by

Mr. Elonis to contact or gain access to any of the parties identified in Counts One through Five of

the indictment, no weapons, and no discussion of a plan, let alone any actual plan.  Therefore,

there is no evidence, beyond the hostile statements posted on Mr. Elonis' Facebook page, of any

threat.  Accordingly, in view of (1) the context in which Mr. Elonis was merely venting his

frustration and anger with disclaimers that his lyrics were fictitious and an expression of free

speech through song or poem,[4] (2) the lack of specificity regarding time, date and place, and (3)

the reaction of the listeners, only one of whom viewed the postings as a serious threat, there is

not substantial evidence to establish that Mr. Elonis' Facebook postings constitute "true threats."

The indictment infringes on Mr. Elonis' First Amendment rights and dismissal is warranted.

**D.**     **The Indictment Is Facially Defective Because It Fails To Allege That Mr.
Elonis Subjectively Intended To Convey A Threat To Injure Others**

Consistent with Third Circuit caselaw, the indictment alleges that Mr. Elonis knowingly

and willfully transmitted the communications containing the threats, but is silent as to his

---

[4]  Indeed, in a post dated October 30, 2010, Mr. Elonis writes: "And it would seem that
I've been the little attention whore extraordinaire lately but really, I'm doing this for me. My
writing is therapeutic."  Attached hereto as Exhibit "B."

19

subjective intent in transmitting the statements.  See United States v. Voneida, 337 Fed.Appx. 246, 248 (3d Cir. 2009) (not precedential) (finding "[w]hile some of the statements, taken in isolation, may not rise to the level of a threat within the meaning of § 875(c)" and such statements only fall within the statute's purview where "[a] rational jury could reasonably construe the statements . . . as a serious intention to inflict bodily harm."  (citing United States v. Alaboud, 347 F.3d 1293, 1296 (11th Cir. 2003) ("A communication is a threat when in its context [it] would have a reasonable tendency to create apprehension that its originator will act according to its tenor.")); see also Kosma, 951 F.2d 549.

Mr. Elonis contends that in order for § 875(c) to comport with the First Amendment, it must apply only to communications in which the defendant subjectively intends to convey a threat.  See Black, 538 U.S. at 359, 367 (holding that Virginia's cross-burning statute violated the First Amendment because the law did not require the state to prove that the defendants intended to intimidate; "'[t]rue threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."); see also United States v. Cassel, 408 F.3d 622, 637 (9th Cir. 2005) (O'Scannlain, J.) (holding that federal statute must require specific intent to intimidate or threaten in order to comply with First Amendment).  As Judge O'Scannlain noted in Cassel, in light of the Supreme Court's holding in Black, any law proscribing threats must require that the communicator intend his words to intimidate in order to withstand First Amendment scrutiny.

Because the indictment in this case does not allege that Mr. Elonis intended to threaten anyone, it is facially defective.  Therefore, Mr. Elonis moves for an order from this Court

20

dismissing the indictment.

### E.       18 U.S.C. § 875 (c) Is Unconstitutionally Overbroad On Its Face

By adopting an objective "reasonable person" standard, the Third Circuit has interpreted § 875(c) to allow for the conviction of defendants – like Mr. Elonis – who intend to convey a political point, but who instead negligently transmit language that a jury interprets as expressing a serious intent to inflict bodily harm.  Because the statute imposes a restriction on the content of protected speech, it is invalid unless it poses strict scrutiny, i.e., it is justified by a compelling government interest and is narrowly drawn to serve that interest.  Rav v. St. Paul, 505 V5 377, 395.  The interpretation of the statute renders it applicable to a wide variety of speech that is protected under the First Amendment and is therefore not narrowly drawn.  It is for this reason that § 875(c) is unconstitutionally overbroad.

"In the first Amendment context . . . a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" United States v. Stevens, 130 S.Ct. 1577, 1587 (2010).  Thus, Mr. Elonis need not show that § 875(c) is unconstitutional as applied to his Facebook page; instead, he must show that the statute implicates a substantial amount of protected expression.  See United States v. Marcavage, 609 F.3d 264 (3d Cir. 2010) (on a facial challenge in the First Amendment free speech context, a plaintiff may demonstrate either that no set of circumstances exists under which the law would be valid, i.e., that the law is unconstitutional in all of its applications, or that the law is overbroad because a substantial number of its applications are unconstitutional, judged in relation to the law's plainly legitimate sweep); see also, United States v. DiPietro, 615 F.3d 1369, 1372-73 (11th Cir. 2010).

21

"The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers."  United States v. Williams, 553 U.S. 285, 293 (2008); see generally McCauley v. University of the Virgin Islands, 618 F.3d 232 (3d Cir. 2010).  As § 875(c) is written, the gravamen of the offense is the transmission of the communication containing the threat to injure. There is no requirement that the government prove authorship of the threatening communication. See United States v. Bloom, 834 F.2d 16, 18-19 (1st Cir. 1987) (interpreting 18 U.S.C. § 876, which proscribes the mailing of any threatening communication).  The only limitation to § 875(c)'s reach comes from Watts, which requires that the threat be a "true threat."  See Watts, 394 U.S. at 708.  As previously noted, the intent of the speaker is not relevant in the Third Circuit.  See Voneida, 337 Fed.Appx. at 248.

After construing the statute, the court must then determine whether the law as construed "criminalizes a substantial amount of protected expressive activity."  Williams, 553 U.S. at 297. Because the intent of the defendant is irrelevant to the analysis, the statute arguably applies to certain personal messages posted on Mr. Elonis' personal Facebook profile page.  Moreover, the statute would also possibly apply to:

> \*    Joyce Kaufman's statement at a political rally in Kentucky: "I am
> convinced that the most important thing the founding fathers did to ensure
> me my First Amendment rights was they gave me a Second Amendment.
> And if ballots don't work, bullets will.  I've never in my life thought that
> the day would come where I would tell individual citizens that you are
> responsible for being the militia that the founding fathers designed – they

were very specific.  You need to be prepared to fight tyranny: whether it

comes from outside or it comes from inside."

\*        President George W. Bush's comments on a national address in March of

2003 that the United States would commence bombing Iraq within 48

hours if Saddam Hussein did not surrender and leave the country.

\*        President Barrack Obama's comments to the Jonas Brothers (a musical

group) that "Sasha and Malia are huge fans but, boys, don't get any ideas.

I have two words for you: predator drones."

\*        The news media's coverage of each of these communications.

\*        Samuel L. Jackson's role in the 1994 film Pulp Fiction where he plays a

hitman who recites a passage from the Book of Ezekial 25:17 prior to

murdering each of his victims.[5]

\*        A consumer's purchase of the movie Pulp Fiction on iTunes, which

knowingly caused Mr. Jackson's threatening communication to be

transmitted in interstate commerce.

These are just a few examples.  Given the astonishing breadth of § 875(c) and the American

cultural obsession with violence, the average citizen likely violates the law several times each

day.  Consider the final example just mention – the hitman from Pulp Fiction.  In the movie, Mr.

---

[5] Mr. Jackson recites a modified version of the passage.  Prior to each murder, he
proclaims: "The path of the righteous man is beset on all sides by the inequities of the selfish and
the tyranny of evil men.  Blessed is he who, in the name of charity and good will, shepherds the
weak through the valley of darkness, for he is truly his brother's keeper and the finder of lost
children.  And I will strike down upon thee with great vengeance and furious anger those who
attempt to poison and destroy my brothers.  And you will know my name is the Lord when I lay
my vengeance upon you."

Jackson's character, Jules, recites a biblical passage before each of his homicides.  This speech would (and should) fall under the scope of § 875(c).  It is uttered by the hitman with the clear intent to terrify his victims.  But in the movie, Jules survives a near-death experience, undergoes a religious awakening, and abandons his life as a hitman, presumably for some altruistic purpose.  Suppose for the sake of argument that this altruistic purpose involves missionary work, which leads Jules to mail a bible to the family of one of his former victims.  In light of Jules' widely known *modus operandi*, the recipient of this package would reasonably construe the bible as a communication containing a threat to injure, and the act of mailing the bible across state lines would violate § 875(c) as it is interpreted by the Third Circuit.  But this conduct also implicates the core protections envisioned by the First Amendment's framers – free speech and freedom of religion.

        As the Supreme Court recently held in Stevens, the First Amendment will not countenance such a result.  The Court in Stevens struck down as overbroad a federal statute banning any visual or auditory depiction "'in which a living animal is intentionally maimed, mutilated, tortured, wounded, or killed,' if that conduct violates federal or state law where 'the creation, sale, or possession takes place.'" 130 S.Ct. at 1582 (quoting 18 U.S.C. § 48(c)(1)).  Although the statute expressly exempted "any depiction 'that has serious religious, political, scientific, educational, journalistic, historical, or artistic value,'" the Court determined that the law implicated more constitutionally protected conduct than it did speech unprotected by the First Amendment.  See id. at 1592.

        Similarly, in Ashcroft v. Free Speech Coalition, 535 U.S. 234 (2002), the Court invalidated on overbreadth grounds two child pornography prohibitions.  The laws prohibited any

24

image that appeared to depict a minor engaging in sexual activity, or marketed as such.  The Court noted that this proscription applied both to unprotected child pornography, as well as to protect speech such as scenes from critically acclaimed films such as *Traffic* and *American Beauty*, in which adult actors portraying minors engaged in sexually explicit conduct.  Accordingly, the Court found the provisions to unconstitutionally overbroad.  Id. at 256-57.

Like the provisions struck down in Ashcroft and Stevens, § 875 (c) covers a substantial amount of protected speech in addition to its prohibitions on threatening communications.  And, unlike the statute in Stevens, there is no exceptions clause exempting speech that has serious artistic or literary value.  The law could be applied to the transmission of virtually any action movie, and renders criminal the trash-talk that occurs before most boxing matches and football games.  In addition, the plain text of the statute could be used to prosecute any member of the news media who covers or disseminates threatening communication made by others.

Finally, to the extent that § 875(c) can be used to prosecute someone who, without intending to threaten, nonetheless transmit a statement that a reasonable person finds intimidating, precedent that is binding on this Court at this juncture would support his or her conviction.  For all these reasons, § 875(c) is substantially overbroad.

**F.      18 U.S.C. § 875(c) Is Unconstitutionally Vague**

Statutes, such as § 875(c), that are insufficiently clear are vague (1) to avoid punishing people for behavior that they could not have known was illegal, (2) to avoid subjective enforcement of the laws based on arbitrary or discriminatory interpretations by government officers, and (3) to avoid any chilling effect on the exercise of sensitive First Amendment freedoms.  Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972).  Vagueness concerns are

25

more acute when a law implicates First Amendment rights and a heightened level of clarity and precision is demanded of criminal statutes because their consequences are more severe.  <u>Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.</u>, 455 U.S. 489, 498 (1982).  To pass constitutional muster, statutes challenged as vague must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited and provide explicit standards for those who apply it to avoid arbitrary and discriminatory enforcement.  <u>See</u> <u>generally</u> <u>Saxe v. State College Area School Dist.</u>, 240 F.3d 200 (3d Cir. 2001).

There can be no legitimate argument made that § 875(c) provides explicit standards for those who apply it.  The statute does not define what constitutes a threat – the only guidance on this issue has come from the courts.  Moreover, any speaker can violate § 875(c) by communicating a statement intended in jest that negligently communicates a true threat.  The law requires every individual who utters, writes, or transmits any statement in interstate commerce to predict what others find to be reasonable.  This clearly fails to provide a person with a reasonable opportunity to know what speech is disallowed and what is not.  As a result, § 875(c) is unconstitutional on vagueness grounds.

## III.  <u>CONCLUSION</u>

In our society, it is rare that the government can interfere with individual expressions of thoughts or ideas.  The essence of the First Amendment is that such ideas, even if crude or distasteful, must be tolerated as part of the national discourse, except within certain narrowly defined situations where the words are used as the tools of illegal activity.  "It is well-established that the First Amendment protects speech that others might find offensive or even frightening."  <u>Fogel v. Collins</u>, 531 F.3d 824, 829 (9th Cir. 2008).  As the Supreme Court has explained:

26

speech "may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with the conditions as they are, or even stirs people to anger.  Speech is often provocative and challenging."  <u>Terminiello v. City of Chicago</u>, 337 U.S. 1, 4 (1949).  For these reasons, the scope of the First Amendment is broad, and the scope of criminal statutes that penalize pure speech is exceedingly small.  Here, the actions that the government allege Mr. Elonis to have taken simply do not fall within one of those narrowly defined circumstances.  Mr. Elonis' speech was protected by the Constitution, and was not in violation of the criminal statute codified at 18 U.S.C. § 875(c).

**WHEREFORE**, for the reasons set forth in the above memorandum of law, as well as in the interests of justice, defendant Anthony Elonis respectfully requests that this Court grant the instant motion and dismiss the indictment in its entirety.

Respectfully submitted,

*/s/ Benjamin B. Cooper*

_____

BENJAMIN B. COOPER
Assistant Federal Defender

27

## CERTIFICATE OF SERVICE

I, Benjamin B. Cooper, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that I have served a true and correct copy of Defendant's Motion to Dismiss the Indictment with Memorandum of Law in Support Thereof, upon Sherri A. Stephan, Assistant United States Attorney, by electronic case filing and hand delivery to her office at the United States Attorney's Office located at Edward N. Cahn Federal Building, 504 Hamilton Street - West, Allentown, PA  18102, on the date indicated below.

*/s/ Benjamin B. Cooper*

_____

BENJAMIN B. COOPER
Assistant Federal Defender

Date:   August 24, 2011

# EXHIBIT "A"

# EXHIBIT "B"